IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **NATIONAL STEEL CAR LIMITED,** § <br> A CANADIAN CORPORATION, § <br> *Plaintiff*, § <br> § <br> v. § <br> § <br> **THE GREENBRIER COMPANIES,** § <br> **INC.,** § <br> *Defendant*. § | CIVIL ACTION 6:19-cv-00721-ADA |

### ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER

Came on for consideration this date the Motion of Defendant The Greenbrier Companies, Inc. ("GCI"), to dismiss or, in the interest of justice, transfer the case. ECF No. 18. Plaintiff National Steel Car Limited ("NSC") filed responsive and supplemental briefings. ECF No. 22; ECF No. 45. Similarly, GCI filed responsive and supplemental briefings. ECF No. 23; ECF No. 48; ECF No. 51. The Court held a hearing on the motion on July 23, 2020.

The Court is once again asked to examine if a heavy burden has been carried in order to transfer a case out of this judicial district. In order to not dismiss this case, the Court must find that the line between GCI and its subsidiaries have so blurred that the two become one. The apple of the Court's eye has always been the faithful and consistent execution of the law. As such, the Court once again finds that the heavy burden has not been carried by clear support; therefore, after careful consideration, the Court **GRANTS** Defendant's motion to transfer.

### I.   Factual Background and Procedural History

NSC brings this claim alleging patent infringement by GCI of U.S. Patent Nos. 7,434,519, ("the '519 Patent") and 7,878,125 ("the '125 Patent") (collectively, "the patents-in-suit"). Compl. ¶ 8, ECF No. 1. Both patents-in-suit are entitled "railroad freight car" and relate

1

"to the field of railroad freight cars." *Id.* ¶¶ 9–10; '519 Patent Ex. A, col. 1:5, ECF No. 1-1; '125 Patent Ex. B, col. 1:13, ECF No. 1-2. NSC claims GCI infringed the patents-in-suit by having "manufactured, used, offered for sale, sold and/or imported into the United States railroad gondola cars covered by one or more claims of the Patents-In-Suit." Compl. ¶ 11, ECF No. 1.

NSC "is a corporation organized and existing under the laws of Canada." *Id.* ¶ 2. GCI "is a corporation organized and existing under the laws of the State of Oregon." *Id.* ¶ 3. GCI "is a publicly-traded holding company that designs, manufactures, leases, sells, and repairs railcars through no fewer than 25 wholly-owned subsidiaries." Def.'s Suppl. Br. in Supp. of Mot. at 2, ECF No. 48. NSC argues that two of these subsidiaries are alter egos of GCI. Pl.'s Resp. in Opp'n to Def.'s Mot. at 4, ECF No. 22. Specifically, NSC alleges that both Greenbrier Rail Services Holdings, LLC ("GRSH") and Gunderson Rail Services, LLC ("GRS") (collectively, "the GCI subsidiaries") are alter egos of GCI. *Id.* at 5, 9.

GCI files this motion to dismiss or transfer, arguing that venue is improper under 28 U.S.C. 1400(b). Def.'s Mot. at 1, ECF No. 18. NSC alleges that GCI "has a regular and established place of business in [the Western District of Texas] at 497 South Tayman St., San Antonio, Texas 78226," (hereinafter, "the San Antonio Property"). Compl. ¶ 3, ECF No. 1. At the time of filing, the San Antonio Property was leased by GRSH and used by GRS to perform its business operations. Pl.'s Resp. at 5, ECF No. 22; Turner Suppl. Decl. ¶¶ 3, 10 ECF No. 50. In February 2020, after the filing of the complaint, the GCI subsidiaries were combined into one corporate entity. Turner Suppl. Decl. ¶ 4, ECF No. 50. NSC alleges that at the time of filing, the Court may find venue proper by considering the San Antonio property and imputing the property to GCI under an alter-ego theory. Pl.'s Resp. at 5, 9, ECF No. 22.

## II.     Legal Standard

28 U.S.C. § 1400(b) constitutes "the exclusive provision controlling venue in patent infringement proceedings." *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514, 1517 (2017) (quoting *Stonite Products Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 563 (1942)). Whether venue is proper under § 1400(b) and which party bears the "burden of persuasion on the propriety of venue" are issues "unique to patent law and [are thus] governed by Federal Circuit law." *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1012–13 (Fed. Cir. 2018). The Federal Circuit has held that the "[p]laintiff bears the burden of establishing proper venue" under 28 U.S.C. §1400(b). *Id.* at 1013. Section 1400(b) provides that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017) (quoting 28 U.S.C. § 1400(b)).

"A domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute." *TC Heartland LLC,* 137 S. Ct. at 1517. The patent venue statute has three general requirements to establish that the defendant has a regular and established place within the judicial district. *In re Cray Inc.*, 871 F.3d at 1360. Those requirements are that "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *Id.* For a "regular and established place of business" to be a "place of the defendant," several considerations apply, such as "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place." *Id.* at 1363.

To impute the property of a subsidiary to the defendant under an alter ego theory, the lines between the defendant and the subsidiary must become so blurred that the two become one. *See Wapp Tech Ltd. P'shi v. Micro Focus Int'l, PLC*, 406 F. Supp. 3d 585, 595 (E.D. Tex. 2019).

3

"Because the alter ego issue is not unique to patent law, . . . court[s] appl[y] the law of the regional circuit." *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1380 (Fed. Cir. 2004). "Where a parent and subsidiary observe corporate formalities, the plaintiff has a heavy burden to establish a degree of control sufficient to impute the subsidiary's jurisdictional contacts to the parent." *Adm'rs of Tulane Educ. Fund v. Ipsen, S.A.*, 450 Fed. App'x 326, 331 (5th Cir. 2011). Additionally, activities consistent with the parent's and subsidiary's relationship should not give rise to a finding of an alter ego. *See United States v. Bestfoods*, 524 U.S. 51, 72 (1998). However, "[t]he presumption of institutional independence of related corporate entities may be rebutted by 'clear evidence.'" *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004). A non-exhaustive list of factors courts may consider include: whether

> (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 418 (5th Cir. 2006).

Ultimately, "there is no litmus test for determining whether a subsidiary is the alter ego of its parent." *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 694 (5th Cir. 1985). Moreover, "[r]esolution of the alter ego issue is heavily fact-specific and, as such, is peculiarly within the province of the trial court. *Id*. If, after examining the relationship between the parent and subsidiary, a court finds venue is improper, then the court must dismiss, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

### III.     Analysis

NSC must meet its heavy burden of showing a sufficient degree of control by GCI to impute the GCI subsidiaries' property to GCI. *See Adm'rs of Tulane Educ. Fund*, 450 Fed. App'x at 331. NSC alleges they have "provided sufficient facts for at least a prima facie case" of alter ego status, relying heavily on the "substantial overlap of officers and executives." Pl.'s Suppl. Br. in Opp'n to Def.'s Mot. at 1, ECF No. 45. The Court has two initial matters to take up. First, the Court notes that NSC must do more than provide a prima facie showing, but rather NSC must rebut the presumption of institutional independence with clear evidence. *Freudensprung*, 379 F.3d at 346. Second, "the alter ego doctrine is an equitable remedy which prevents a company from avoiding liability by abusing the corporate form." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999). The Court is hesitant to allow plaintiffs to manufacture proper venue through the use of an equitable remedy. However, the Court acknowledges NSC's thorough analysis and understands that courts have used this doctrine to impute contacts in order to exercise personal jurisdiction. Nevertheless, the Court does not find "clear evidence" to rebut the "institutional independence of related corporate entities." *See Freudensprung*, 379 F.3d at 346.

#### A.  Corporate Formalities

When the parent and subsidiary observe corporate formalities, a heavy presumption exists that the subsidiary is not an alter ego of the parent entity. *Cf. Adm'rs of Tulane Educ.*, 450 Fed. App'x at 333 (not imputing the contacts of the subsidiary to the parent based on the heavy burden which exists when the corporate formalities are observed). Here the Court finds that GCI maintains its corporate formalities between itself and the GCI subsidiaries.

Both parties reference several agreements between GCI and GRS that show GCI's compliance with corporate formalities. The record includes four examples of where the express consent from GRS managers was required before titles could be changed, assets could be distributed, credit agreements entered, or before real property could be sold by GCI. Combined Consent to Action Ex. 1, ECF No. 45-1 (ratifying and approving all current officers and their current titles for administrative convenience); Written Consent of GRS Ex. 7, ECF No. 45-7 (consenting to the distribution of certain GRS assets and liabilities for purposes of consummating the Joint Venture with Watco); Manager Consent Ex. 9, ECF No. 45-9 (consenting to adopt resolutions by GRS managers); Roberts Suppl. Decl. ¶ 6, ECF No. 23-2 (asserting that GCI required the consent of the subsidiaries before pledging the subsidiaries' assets for the purposes of a credit agreement). The Court finds this undisputed evidence persuasive in determining that GCI maintains corporate formalities.[1]

### B. Undercapitalization of the subsidiary

Undercapitalization is often a critical factor in alter ego analysis. *Bridas S.A.P.I.C.*, 447 F.3d at 420. As "the alter ego doctrine is an equitable remedy which prevents a company from avoiding liability by abusing the corporate form," when there is scant evidence that the subsidiary would be unable to pay a judgment, it weighs heavily against a finding of alter ego status. *See Gardemal*, 186 F.3d at 594.

Here, GCI has provided ample evidence that GRS is well funded and could pay a final judgment if necessary. "GRS annually takes in over [hundreds of] million[s of] dollars in revenue and pays out tens of millions of dollars for operating expenses, such as parts, equipment, supplies, and the salaries of GRS employees." Def.'s Suppl. Br. at 10, ECF No. 48 (citing

---

[1] NSC argues that this consent is a "foregone conclusion" due to the overlap of officers between GRS and GCI. Pl.'s Suppl. Br. at 10. However, the Court appropriately discusses this in reference to the relevant factor of "the sharing of common officers and directors."

evidence in the record). Contrastingly, after extensive discovery, NSC does not dispute that either GCI subsidiary operates with grossly inadequate capital. *See generally,* Pl.'s Suppl. Br., ECF No. 45. NSC does argue that the GCI subsidiaries consolidate their finances with GCI. However, this argument fails to satisfy the purpose of finding alter ego status, which is to prevent parent entities from escaping liability by allowing "the subsidiary [to] operate[] with grossly inadequate capital." *Bridas S.A.P.I.C.*, 447 F.3d at 420.

### C. Other factors not in favor of finding alter ego status

The Court finds several other factors also weigh in favor of finding that GRS is not an alter ego of GCI. GCI presents substantial evidence that GRS is an independent corporate entity. GRS has "existed as a separate legal entity for 27 years and now employs roughly 1,000 workers at 19 locations across the United States." Def.'s Suppl. Br. at 1, ECF No. 48; Turner Suppl. Decl. ¶¶ 2, 11, ECF No. 50. Those employees, with exceptions for executive-level management, are paid directly by GRS. Turner Suppl. Decl. ¶ 11, ECF No. 50. Additionally, evidence exists that even the executive compensations are eventually reimbursed by GRS to the subsidiary responsible for executive compensation. *Id.* Further, GRS only obtains five percent of its business from GCI and "prepares its own budgets and long-term financial plans for its financial performance and tracks its own performance against those plans." Def.'s Suppl. Br. at 1; Turner Suppl. Decl. ¶ 8, ECF No. 50.

Additionally, GRS maintains its own management team as "[n]one of the GRS senior management team works from GCI's headquarters." Turner Suppl. Decl. ¶ 4, ECF No. 50. GCI identifies four GRS employees in charge of the day-to-day operations of GRS, including the tasks of "hiring employees, setting pricing, creating schedules, and making purchasing decisions." Turner Suppl. Decl. ¶ 3, Mar. 20, 2020, ECF No. 23-1 (identifying Rick Galvan, Sue

Baacke, Bob Grganto, and Wesley Arthur). The Court finds that NSC fails to rebut this evidence with clear evidence to the contrary. Pl.'s Suppl. Br. at 15, ECF No. 48 (claiming that Galvan and Grganto identify themselves on LinkedIn as working for "[t]he Greenbrier Companies"). Additionally, the Court finds that the allegations that Mr. Turner "inform[s] the board of [GCI, as to] what [he is] doing with the repair business" and that Ms. Tekorius attends GRS meetings "to present on topics such as 'Overview' and 'Corporate Update'" are all within the expected activities of the normal parent-subsidiary relationship. *Id.* at 8 (referencing Turner Dep. Ex. 19, 67:13–16, ECF No. 45-19; GRS Meeting Agenda Ex. 23, ECF No. 45-23; GRS Meeting Agenda Ex. 28, ECF No. 45-28). Therefore, the Court further finds the above facts support no finding of alter ego for GRS when considering the factors of whether: the parent finances the subsidiary; the parent pays salaries and other expenses of the subsidiary; the subsidiary receives no business except that given by the parent; and whether the daily operations of the two corporations are kept separate. *Bridas S.A.P.I.C.*, 447 F.3d at 418.

### D.  Factors in favor of finding alter ego status

It is undisputed that some factors do weigh in favor of finding alter ego status. GCI and the GCI subsidiaries share a number of executive officers. Specifically, NSC has identified seven executives that enjoy the same or similar title at GCI and the GCI subsidiaries. *See* Chart of Officer Overlap Ex. 16, ECF No. 45-16 (identifying William Furman, Lorie Tekorius, Mark Rittenbaum, Martin Baker, Adrian Downes, Justin Roberts, and Rick Turner as executives of all three relevant entities; also identifying Kevin Maughan as assistant general counsel and secretary, Gretchen Brask as a senior staff attorney and assistant secretary, and Christian Lucky as assistant general counsel and assistant secretary). Additionally, both GRS and GRSH were wholly-owned by GCI at the time of filing. Further, GCI files the federal tax returns for the GCI

subsidiaries, the GCI subsidiaries share an IT, legal and travel department with GCI, and the use of joint bank accounts between the three entitites all weigh in favor of finding alter ego status. However, the Court is unpersuaded that any of these facts are outside normal activities consistent with a parent- subsidiary relationship. *See Bestfoods*, 524 U.S. at 72.

The most substantial factor weighing in favor of finding alter ego status for GRS is that GRS "will make distributions to [GCI], if any, at such time and in such amounts as [GCI] determines in its *sole* discretion." GRS LLC Agreement Ex. 2, at 2, ECF No. 45-2 (emphasis added); Roberts Dep. 25:8–13, ECF No 45-18 (confirming the meaning of the GRS LLC Agreement). The Court does find that this activity somewhat blurs the line between GCI and GRS. Ultimately, "there are some factors in favor of imputing contacts and some factors against. Even where some factors suggest that one entity is the alter ego of another, the maintenance of corporate formalities tips in favor of finding that the entities are not alter egos." *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 588 (5th Cir. 2010). Therefore, the Court finds that GRS is not an alter ego of GCI.

### E.  Additional jurisdictional concerns

In its supplemental briefing, GCI combines GRS's activity with that of GRSH as the subsidiaries were rolled into one corporate entity after the complaint was filed. However, "[i]t has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Glob. Group, L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)). Regardless of the evidence that the Court must exclude from its consideration, NSC still carries the heavy burden of establishing alter ego status. *Adm'rs of Tulane Educ. Fund*, 450 Fed. App'x at 331. Even assuming the Court

9

did find GRSH to be an alter ego of GCI, the Court believes venue would still be improper under Federal Circuit precedent for two reasons.

The first jurisdictional concern is that a "regular and established place of business requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged place of business." *In re Google LLC*, 949 F.3d 1338, 1345 (Fed. Cir. 2020) (internal quotation marks omitted). During the hearing, the parties stated they believed GRSH had no employees at the San Antonio property. With no evidence of either a GCI or GRSH employee or agent at the San Antonio property conducting either GCI or GRSH business, the Court could not find that the second *Cray* factor had been satisfied to render venue proper. *In re Cray Inc.*, 871 F.3d at 1360.

The second jurisdictional concern is that a regular and established place of business may not use "sporadic activity [to] create venue." *In re Cray Inc.*, 871 F.3d at 1362 (referencing *Phillips v. Baker*, 121 F.2d 752, 756 (9th Cir. 1941)). "A 'regular place of business' is, obviously, a place where such business is carried on 'regularly' and not merely temporarily, or for some special work or particular transaction." *Phillips*, 121 F.2d at 756. The Court's concern is that GCI created GRSH for a joint venture with a third-party Texas corporation. Turner Suppl. Decl. ¶ 3, ECF No. 50. After the dissolution of the joint venture, GRSH was also eventually dissolved. *See id.* The Court finds that even if GRSH was found to be an alter ego of GCI and even if GRSH had employees who could be deemed to be agents of GCI, that there is no evidence that the business GRSH was conducting could be determined to be regular and established to satisfy the patent venue statute. Therefore, the Court finds determining GRSH's alter ego status moot as the patent venue statute can not be satisfied under either GRSH's or

GCI's purported regular and established place of business. Consequently, the Court finds that venue is improper in this judicial district.

### F. Transferring the case

After having found that venue is improper in the Western District of Texas, the Court must either dismiss the case, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). There is no dispute that this case could have been brought in Oregon. Section 1400(b) provides that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides. 28 U.S.C. § 1400(b). "A domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute." *TC Heartland LLC,* 137 S. Ct. at 1517. GCI is incorporated under the laws of the State of Oregon. Compl. ¶ 3, ECF No. 1. Therefore, GCI, for the purposes of the patent venue statute, resides in Oregon. The Court finds that the potential evidence and witnesses in Oregon support transferring the case in the interest of justice. Roberts Decl. ¶¶ 16–20, ECF No. 18-1 (stating that the "documents and witnesses related to the design and development of the accused railcars" are in Oregon, that the "marketing, promotion, and sales functions related to the accused railcars are based principally" in Oregon, and identifying two potential witnesses that reside in Oregon).

### IV.     Conclusion

Based on the foregoing, the Court finds that NSC has not met its burden of proving that venue is proper within the Western District of Texas. Therefore, it is **ORDERED** that GCI's Motion is **GRANTED** and this case, in the interest of justice, be **TRANSFERRED** to the District of Oregon.

**SIGNED** this 27th day of July, 2020.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE